# IN THE COURT OF APPEALS OF IOWA

————————————

No. 25-0904
Filed April 29, 2026

————————————

**In re the Marriage of Stephanie Nicole Higgins and**

**Robert James Higgins**

Upon the Petition of
**Stephanie Nicole Higgins,**
Petitioner–Appellee,

And Concerning
**Robert James Higgins,**
Respondent–Appellant.

————————————

Appeal from the Iowa District Court for Webster County,
The Honorable Ashley Sparks, Judge.

————————————

**AFFIRMED**

————————————

Jamie Hunter of Dickey, Campbell & Sahag Law Firm, P.L.C., Des Moines,
attorney for appellant.

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West
Des Moines, attorney for appellee.

————————————

Considered without oral argument
by Greer, P.J., and Schumacher and Chicchelly, JJ.
Opinion by Greer, P.J.

**GREER, Presiding Judge.**

Robert Higgins appeals from certain provisions of the decree dissolving his marriage to Stephanie Higgins. Arguing he was prejudiced because the district court excluded his exhibits and witness testimony from the trial as a sanction, Robert requests a new trial. Robert also disputes the custody award as he advocated for joint legal custody, and he asserts the property division award failed to do equity between the parties. Finally, he requests an award of his appellate attorney fees. Stephanie also requests that Robert pay her appellate attorney fees.

After our review, we find that the district court properly imposed sanctions on Robert, that the determination of sole custody with supervised visitation was correct, as was the property division, and that neither party should be awarded appellate attorney fees. We affirm.

## I. Background Facts and Proceedings.

Stephanie and Robert married on September 17, 2016, and have one child together, born in 2016. The couple separated in December 2023 with Robert staying in the marital home and Stephanie moving with the child to her father's home. Both residences were in the same town. Stephanie filed for a dissolution of the marriage in February 2024; the trial was held in February 2025. At the time of trial, Stephanie was thirty-five years old and was employed in cybersecurity for the Iowa Air National Guard. Robert, age forty-seven, had lost his job with the Iowa Army National Guard,[1] but now worked at a bar and his income was supplemented though his military retirement and veteran benefits.

---

[1] Robert was terminated from employment with the Iowa Army National Guard in January 2023.

In early 2023, the Iowa Department of Health and Human Services (HHS) became involved with the family after the department received a report that Robert was using methamphetamine. There were other allegations related to the failure to supervise the child around unsecured firearms and domestic assault against Stephanie by Robert. The HHS report noted concerns about Robert's "use of illegal drugs," which he admitted, and concerns "about the parents' relationship and use of anger skills." During the investigation, Stephanie and the child moved into the home of Stephanie's father, but when HHS closed the case, they moved back into the marital home with Robert. Then, in November, HHS became involved again after reports that Robert was again using methamphetamine and that he "scuffled" with Stephanie in the presence of the child. The HHS report noted that the allegations of denial of critical care and use of dangerous substances were founded. Robert admitted his use of methamphetamine due to his depression and issues with the marriage. After determining that the allegation of use of dangerous substances was founded, HHS developed a voluntary services safety plan in January 2024, with Robert agreeing to supervised contact with the child.

The HHS safety plan provided that Robert would: (1) "have supervised visits with [the child]," (2) "get a substance abuse evaluation [and] follow the recommendations," (3) work with HHS and another agency, and (4) engage in drug tests as requested by HHS. In February, Stephanie filed for dissolution of the marriage. A no-contact order had been put in place between Stephanie and Robert, but, after the hearing on that issue, it was dismissed upon Robert's agreement to abide by the HHS safety plan. Then, on April 1, the HHS social work case manager alerted the parties' counsel that a supervisor had not been approved to supervise Robert's visits with the

child because "Robert stated he wouldn't participate in any services. . . . [H]e feels he does not need supervised interactions."

Stephanie petitioned for a dissolution of the marriage; the district court addressed her subsequent motion to determine temporary custody and visitation of the parties' child. Just prior to the hearing, Robert was charged with forgery for accessing Stephanie's bank account and taking funds. The April 3 temporary custody order established temporary joint legal custody in the parents with primary physical care in Stephanie, but the order copied the safety plan established by HHS with set deadlines for compliance, conditioning Robert's parenting time on his sobriety and requiring the visits to be supervised by Robert's mother.

The plan also mandated that Robert complete a substance-use evaluation and provide a release of information to the attorneys in the case. Specific limited visitation was set out conditioned on obtaining a substance-use evaluation and a clean drug patch test result. Robert testified at the temporary hearing that he sought intensive outpatient treatment and had submitted to drug testing at the U.S. Department of Veterans Affairs. But, that treatment was completed in March 2024. As far as any HHS drug testing, none was ever accomplished, and Robert did not provide any substance-use evaluation results. At the temporary-matters hearing, Robert said he was never asked by HHS to provide drug testing and, at the dissolution trial, he testified he could not afford to do the tests. Regardless, Robert has not had contact with the child, supervised or otherwise, since April 2024, when the temporary-matters order was issued.

During the progress of the case, Robert filed various pleadings, including several motions for temporary custody, motions to reconsider, and

an application for rule to show cause. In August, Robert's attorney withdrew, and Robert has been self-represented until this appeal.

Without counsel to communicate with, in September, Stephanie moved to compel discovery responses. In the motion, she referenced an email from Robert where he indicated that he would not respond to discovery until he was allowed to speak to his child. Robert did not resist the motion to compel, and the district court gave him until October 15 to fully answer the discovery requests. After the deadline passed, with no discovery forthcoming, Stephanie moved for sanctions. The district court reviewed the discovery requests before ruling, and while Robert responded to the motion for sanctions, he never formally answered the discovery requests. On November 13, the district court ordered that Robert "is prohibited from presenting information or evidence that was requested in discovery but not provided to [Stephanie] *without further order of the Court*." (emphasis added).

A one-day trial occurred in February 2025 where both parties testified. Prior to the trial, the parties were required to meet, and they arrived at a pretrial stipulation on several issues. Because they could not agree on the issue of custody, Stephanie urged the court to award her sole custody. Robert advocated for joint legal custody. Both parties requested primary physical care. Setting out several factors, the district court found it was not in the best interests of the child to award joint legal custody primarily because of evidence that Robert's stability had declined over the past two years before the trial, including his use of methamphetamine and his erratic behavior. Thus, it awarded sole custody, with primary physical care, to Stephanie. Visitation for Robert was limited, with graduated increases in time, and the court required that Robert's mother—or a party approved by Stephanie—supervise the visits.

In the property division stipulation, the parties did come to a consensus about some of the personal property, but there were other disputed items. Robert contests the equal division of the equity in the marital home and the court's mistaken belief that he had a Thrift Savings Plan (TSP) account similar to Stephanie's, which were set off against each other. As for the marital home, Robert purchased it three years before he and Stephanie married. Although they married in 2016, she was not placed on the title until 2020. Because he paid all the mortgage payments and utilities, Robert asserts that he should get the benefit of the equity accrued during those three years before the marriage and the remainder should then be divided equally. The district court divided the home equity equally, credited a TSP account to both parties, and made no division of those funds between the parties. Robert appeals.

## II. Standard of Review.

"We review dissolution cases de novo." *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). We are not bound by the factual findings of the district court, but "we give them weight, especially as to credibility determinations." *Thorpe v. Hostetler*, 949 N.W.2d 1, 5 (Iowa Ct. App. 2020); Iowa R. App. P. 6.904(3)(g).

We review a district court's order imposing discovery sanctions for an abuse of discretion. *In re Marriage of Williams*, 595 N.W.2d 126, 129 (Iowa 1999).

## III. Analysis.

Because Robert asks for a new trial, we first address his arguments related to the sanctions imposed against him. Then we can turn to his

arguments over child custody, the property division, and the attorney fee requests.

**A. Sanctions.** On July 2, 2024, Stephanie served interrogatories and requests for production on Robert to obtain discovery responses before trial. At the time, he was represented by counsel. Robert's counsel withdrew from representation in August. Now without counsel, Robert failed to answer the discovery requests within the thirty days provided under Iowa Rules of Civil Procedure 1.509(1)(d) (requiring answers to interrogatories within thirty days of service) and 1.512(2)(b)(1) (requiring responses to the requests for production within thirty days). In mid-September, Stephanie moved to compel responses and Robert did not resist the motion. After noting the status of discovery dispute, the district court granted the motion to compel and ordered Robert to respond to the discovery requests "on or before October 15, 2024" and that the "failure to comply with this order may result in the imposition of sanctions under the Iowa Rules of Civil Procedure." That deadline was not met, and Stephanie moved for sanctions in mid-October.

To obtain a better understanding of the discovery issue, the district court ordered Stephanie to provide a copy of the interrogatories and requests for production served on Robert. At this point, Robert moved for a protective order, asserting discovery was too broad, placed an unreasonable burden on him, and encroached on his protected rights. Robert described Stephanies's activity in the case as "litigation abuse." The district court followed that pleading with an order stating it would "not respond to [Robert's] motion for a protective order until [Stephanie] identifies the specific items she needs and/or is requesting for trial." After the October 1 order compelling discovery responses and before the trial date, rather than preparing and

8

answering discovery, Robert filed three more motions or affidavits related to temporary custody and visitation. One filing included a petition, with 125 signatures from people, that alleged:

> On December 28, 2023 [the child] was taken by his mother Stephanie when [Robert] confronted her about her physical and emotional abuse. Stephanie has used litigation, false charges, and false testimony to obtain Temporary Custody of [the child] on April 1, 2024. [Robert] has not been allowed to speak to his son since. Stephanie has conditioned [the child] to fear [Robert]. She made him believe he'll be taken away by Police if he's with his father. She continues to slander [Robert] to anyone who doesn't know [Robert]. This includes school officials and daycare workers.

On November 13, the district court applied sanctions against Robert, noting that Robert had not yet complied with discovery. He was then "prohibited from presenting information or evidence that was requested in discovery but not provided to [Stephanie] *without further order of the Court*." (emphasis added). No other activity occurred in the matter until end of December when the district court filed a pretrial order requiring the parties to list proposed witnesses and exhibits within five days of trial. The order also indicated that any discovery disputes should be filed not less than five days before trial. Robert filed the required financial affidavit and set out his positions on the issues, along with a parenting plan, but he did not file any witness or exhibit lists or file any motion regarding discovery disputes but for his previously filed motion for protective order. The parties also jointly filed the required pretrial report five days before trial. But Robert did file his proposed exhibits in advance of trial.

Stephanie filed a witness and exhibit list, indicating she and Robert would testify. Although Robert submitted an "exhibit" setting out the names of 125 witnesses, he told the court he only wanted to call two of those witnesses. The court excluded admission of the exhibit because Robert listed

what he believed the witness would say and Robert agreed with that exclusion. At the start of trial, Stephanie reminded the court that there was a sanction order and moved to exclude all witnesses and exhibits filed by Robert. In response, Robert contended that on November 8, he "gave her an email description of what my arguments were going to be and I did provide attachments for her knowledge to be aware of what my arguments were going to be." Stephanie described Robert's emails as "extraordinarily lengthy" and "argumentative." Stephanie's attorney relayed that Robert had indicated in his email to her that if his emails would increase Stephanie's attorney fee bill, "he would just keep going and going." So she refused to respond to his emails, which she described as efforts to engage in conflict. As for the November 8 email, the court reviewed it and noted it pointed out Robert's position on several issues and Stephanie's attorney represented that, on her cursory examination, its attachments did not line up with Robert's proposed exhibits. The court took the matter under advisement to review the documents and proposed exhibits.

After fully reviewing the sanction issue, the district court detailed the circumstances leading to what became its decision to restrict both Robert's two witnesses from testifying and most of the proposed exhibits filed. To that end, the court reasoned:

> It appears that Mr. Higgins, based on my review of the exhibits just briefly to get a sense what they were, is willing to provide a bunch of information that he believes supports his positions; however, he is not able or willing to provide some of the simplest things, such as a paystub, retirement value, credit card values, things along those lines. That is not included in the file. It would appear by the file that Mr. Higgins is going to provide what he wants to provide.
>
> . . . .

10

In addition to the comments previously made by the Court, the Court also finds that many of these exhibits, at least at first glance, the Court did not have any foundation laid, appear to be hearsay in nature. Many of the exhibits are text messages, sometimes between Ms. Higgins and Mr. Higgins. But at other times between Mr. Higgins and other people. Some of the exhibits are videos that Mr. Higgins is basically describing as the video goes or providing his own information to go along with that video. These are things Mr. Higgins can testify about. The additional exhibit of him explaining it is not really a proper exhibit for the purposes of trial.

The Court would also note that a handful of the exhibits are also court documents that the Court would otherwise have access to. Aside from being excluded under the ruling for sanctions, most, if not all, of these exhibits would have grounds to be excluded as a result of those reasons.

During the trial, most of Robert's proposed exhibits were not admitted, except for Robert's drug test results from before the temporary custody order, clinical treatment notes, and a chart listing Robert's exhibits by number, date, who would testify about it, and a summary of what it contains for appeal purposes. Most of the topics in the exhibit summary were covered as positions Robert shared during his trial testimony. The other exhibits not admitted, as described by the court and found in the listing of exhibits, were videos of Robert, various pleadings, and text messages.

On our review, the discovery requests served on Robert appear to be standard requests, addressing topics that were issues in the case. And while Robert contends that he tried to provide the information by email to Stephanie's counsel, he did not formally answer the discovery, certify the answers were correct, or provide a record on appeal, such as an offer of proof,[2] to establish compliance with the discovery rules. In his appellate

---

[2] "An offer of proof is necessary for two reasons: (1) to give the trial court a more adequate basis for its evidentiary ruling; and (2) to make a meaningful record for appellate review. A meaningful record for appellate review exists when the court does not have to

11

brief, Robert argues that he emailed documents to Stephanie's counsel on November 8 and that those records should not have been excluded at trial. But he admits that the email was not made part of the trial record and it is "unclear what information was attached."

We do not utilize a deferential standard when people choose to represent themselves, nor can we take on a role of explaining how the discovery process must work. *See Newell v. State*, No. 21-0273, 2022 WL 108572, at *3 (Iowa Ct. App. Jan. 12, 2022) (finding obligations surrounding the requirements for disclosing experts fell on the litigant alone whether represented by counsel or self-represented). If people "choose to proceed pro se, they do so at their own risk." *See Kubik v. Burk*, 540 N.W.2d 60, 63 (Iowa Ct. App. 1995).

"To ensure our district courts have the tools to effectively manage pretrial conduct and control the conduct of the trial, we have recognized the inherent power of the district court to enforce pretrial orders by imposing sanctions." *Fry v. Blauvelt*, 818 N.W.2d 123, 130 (Iowa 2012). Here the district court set out specific findings related to Robert's failure to respond to discovery after a full review of the discovery propounded and the lack of effort made by Robert and determined that the two witnesses and most of his proposed exhibits should be excluded. Given Robert's lack of effort, disregard of the court orders, and conduct showing an intent to only produce what would support his position, we see no abuse of discretion in limiting the witnesses and exhibits at trial. *See In re Marriage of Benson*, No. 03-1388, 2005 WL 425461, at *2 (Iowa Ct. App. Feb. 24, 2005) (finding no abuse of discretion by precluding pro se party from offering any testimony, evidence,

___

speculate on the evidence sought to be introduced." *Brooks v. Holtz*, 661 N.W.2d 526, 529 (Iowa 2003) (cleaned up).

or witness at trial that was not reasonably disclosed). "A district court's order imposing discovery sanctions will not be disturbed unless the court abused its discretion." *In re Marriage of Williams*, 595 N.W.2d 126, 129 (Iowa 1999). From our view, we find the district court properly exercised its broad discretion related to these discovery deficiencies.

We find the district court operated within its discretion in establishing the sanctions for Robert's failure to provide discovery responses and deny Robert's request for a new trial.

**B. Custody Determination.** At trial, Stephanie requested sole custody and Robert asked for joint legal custody. With joint legal custody, "both parents have legal custodial rights and responsibilities toward the child" and "neither parent has legal custodial rights superior to those of the other parent." Iowa Code § 598.1(3) (2025). Robert asserts that until Stephanie's manipulations of the legal system, he was an active father with a close relationship with his child and that she, not he, was the aggressive partner in their marriage. But, the district court set out clear and specific reasons for its determination that the best interests of the child would be met under a sole custody arrangement. Only Stephanie and Robert testified, and the district court found Stephanie more credible. Although not bound by them, we give weight to the credibility findings of the district court given its in-person view of the parties. *In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009) ("[W]e recognize that the district court was able to listen to and observe the parties and witnesses.").

Added to the credibility concerns, we cannot get past the safety concerns that are flagged in this matter. With Robert's admitted methamphetamine use and the lack of compliance with the conditions that would ensure safe contact with the child, we find clear and convincing

evidence that joint legal custody is not in the child's best interests. Stephanie testified to seeing evidence of Robert's drug use in their home as early as 2021, after which Robert became less stable and his behavior more erratic, often being gone at night until 3:00 or 4:00 a.m. For example, Robert was committed in 2023 after threatening to kill himself. On the topic of safety, Stephanie testified and produced photographs that Robert left unsecured firearms around the home. In addition to the safety issues, the parents had trouble communicating with each other, often leading to abusive and violent situations that the child witnessed.

After reviewing the record as a whole and after considering the factors found in Iowa Code section 598.41(3)[3] (listing often overlapping factors to

---

[3] Section 598.41(3) lists these factors:

    a. Whether each parent would be a suitable custodian for the child.

    b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.

    c. Whether the parents can communicate with each other regarding the child's needs.

    d. Whether both parents have actively cared for the child before and since the separation.

    e. Whether each parent can support the other parent's relationship with the child.

    . . . .

    g. Whether one or both of the parents agree or are opposed to joint custody.

    h. The geographic proximity of the parents.

consider when evaluating custody and physical care), we affirm the grant of sole custody to Stephanie.

**C.  Property Determination.**  The gist of Robert's argument over the division of property relates to the equity in the marital home and how to divvy that equity up.  He also addressed the retirement account division as inequitable.

At the time of trial, Robert lived in the home that he purchased in 2013, three years before the parties married.  After they married in 2016, Robert signed a deed adding Stephanie's name to the title and filed it in 2020.  With that timeline, Robert contends the district court failed to consider the three years of equity that built up before the marriage and that, even after they married and after he added Stephanie to the title, he was the person paying the mortgage and the utility obligations.

Building on this alleged failure by the court, Robert asserts that because Stephanie did not make payments towards the marital home, she contributed more in her TSP account, "amassing over $40,000" in the account.  He points to the decree and argues that the court did not take that into account and, even worse, awarded him a retirement account that he no

i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.

j. Whether a history of domestic abuse, as defined in section 236.2, exists.  In determining whether a history of domestic abuse exists, the court's consideration shall include but is not limited to commencement of an action pursuant to section 236.3 [or] the issuance of a protective order against the parent . . . .

longer had. He asserts that the court should have awarded him a "marital portion" of Stephanie's TSP account.

Turning to the record, after hearing the evidence and considering the factors in section 598.21(5), the district court set out a very clear and detailed property division chart. One factor to consider is the length of the marriage, which was nine years, and the court considered the contributions each made to the marriage. While the parties kept their earnings separate, and Robert made more money for most of the marriage, both parties paid marital debt and supported the child.

Yet, the district court was hindered because although Stephanie tried to have the home appraised for trial, that appraisal could not be accomplished because of Stephanie's inability to get ahold of Robert. Because the district court did not identify a value for the marital home, it ordered an appraisal and an equal division of the equity following the appraisal.

Regarding the division of the retirement accounts, the district court did not include the accounts as "they each have a military retirement, and the value of Robert's retirement is unknown." This language appears to be taken from the pretrial stipulation where, under both parties' signature, Stephanie disclosed her TSP account, valued at $40,256.89, and Robert's TSP account was noted as having an "unknown" value. After the court set off these retirement accounts, Robert did not file a motion to reconsider the division. The district court could rely upon the pretrial stipulation, as can we. We find no reason to disturb the district court's treatment of the retirement assets.

The division of the marital home equity requires a more in-depth analysis, but the result is the same. To the extent that there is equity in the

home that was premarital, Robert had to show what that number was and he did not. Robert did not establish the value of the home and so the district court ordered a post-trial appraisal, but more importantly, Robert did not establish what the home equity was in the three years before the marriage. And even though there likely was some equity, just because it was a premarital asset does not mean that it is automatically set off to Robert. We start with the premise that "[p]remarital property may be included in the divisible estate." *In re Marriage of McDermott*, 827 N.W.2d 671, 678 (Iowa 2013). As we have said on many occasions, "the property brought to the marriage by each party is only a factor to consider together with the other relevant factors in determining an equitable property division." *In re Marriage of Brainard*, 523 N.W.2d 611, 616 (Iowa Ct. App. 1994). We do not "separate a premarital asset from the divisible estate and automatically award it to the spouse that owned the property prior to the marriage." *In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007) (cleaned up).

Stephanie and Robert moved in together in 2012, and then they moved together into the marital home after its purchase in 2013. Stephanie testified that she helped with many expenses of the family and thus it is not inequitable to equally divide the equity, including the three years of claimed equity in the home before the marriage. "It is important to remember marriage does not come with a ledger." *Id.* at 103.

For the reasons stated above, we affirm the district court's equitable division of property.

**D. Appellate Attorney Fees.** Both parties request appellate attorney fees. As an appellate court, we have discretion to award or not award attorney fees and, when doing so, we consider the needs of the party requesting fees, the ability to pay, and the merits of the appeal. *See McDermott*, 827 N.W.2d

17

at 687. The parties have monthly gross income within a few hundred dollars of each other.[4] Given that "the controlling considerations in the attorney fee determination are the parties' respective abilities to pay," and that here their ability is relatively comparable, we decline to award appellate attorney fees. *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013).

### IV. Conclusion.

We find the district court appropriately exercised its broad discretion with the sanction imposed for discovery violations. After considering Robert's other challenges, we affirm the district court's custodial determination and its equitable division of assets. We decline to award either party their appellate attorney fees.

**AFFIRMED.**

---

[4] The parties stipulated that Stephanie's monthly income was $5,381 and Robert's monthly income was $4,663.